**NOT FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 24-13326
Non-Argument Calendar

————————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*versus*

DONNELL LEMAN MOORE, JR.,
  a.k.a. Donnie,
  a.k.a. D.,
  a.k.a. Ghost,

*Defendant-Appellant.*

————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:23-cr-00358-KKM-TGW-1

————————————

Before JORDAN, KIDD, and ED CARNES, Circuit Judges.

PER CURIAM:

A federal grand jury indicted Donnell Leman Moore, Jr. on six counts of drug distribution crimes involving cocaine and methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), 841(b)(1)(C), and 846. He pleaded guilty to all six counts. The district court imposed a 240-month sentence as to each count to run concurrently followed by a total supervised release term of five years.

The parties agree that the district court miscalculated Moore's criminal history category, which resulted in an inflated sentencing guidelines range. Because Moore has shown that there is a reasonable probability that the miscalculation affected his sentence, and thereby his substantial rights, we vacate his sentence and remand for resentencing, but we uphold the district court's application of the firearm and premises enhancements.

**I.**

Moore was indicted by a federal grand jury in October 2023, along with nine other co-defendants. The indictment charged that Moore conspired with these co-defendants to distribute and possess with intent to distribute 50 grams or more of methamphetamine and a mixture and substance containing cocaine, in violation of 21 U.S.C. §§ 841(b)(1)(A), 841(b)(1)(C), and 846. It also charged Moore with five other counts related to the distribution of and possession with intent to distribute those drugs, in violation of § 841(b)(1)(A) and 841(b)(1)(C).

At his plea hearing,[1] the court read all six counts against Moore, and he pleaded guilty to each count.[2]  The court ensured that Moore understood the significance of pleading guilty to each charge and that some of the charges carried possible sentence enhancements.  After Moore stated that he understood, the court read aloud the factual basis for each count.

For Count One, Moore agreed that he had "plans to distribute and possess with intent to distribute" 50 grams or more of methamphetamine and "some cocaine."  For Count Two, Moore agreed that he gave 50 grams or more of methamphetamine to an individual while the two were at Moore's garage,[3] and the plan was for that individual to distribute it.  For Count Three and Four, Moore agreed that he supplied "some cocaine" to another individual, who then sold the drugs to a confidential informant.  For Count Six, Moore agreed that another individual came to his garage and obtained cocaine from him.  And for Count Seven, Moore agreed that he met another person at a gas station and supplied that person with cocaine.

---

[1] Moore consented to have his plea heard by a magistrate judge, and a district judge later adopted the magistrate judge's recommendation to accept Moore's guilty plea.

[2] Moore, through counsel, explained at his plea hearing that the government did proffer a plea agreement, and he chose to decline it.

[3] The garage was not discussed further at the plea hearing, but according to the PSR and testimony presented at the sentence hearing, Moore's garage was a fenced-in, commercial garage that he rented, which was located at 2114 West Parker Street, Lakeland, Florida.

The court informed Moore that Counts One and Two carried a minimum mandatory term of ten years imprisonment and a maximum term of life, the remaining counts each carried a maximum term of 20 years imprisonment, and all counts carried a term of supervised release along with the possibilities of steep fines. Moore stated he understood all of that. With the court's warnings and explanations in mind, Moore told the court he still pleaded guilty.

Before Moore's sentence hearing, a probation officer prepared a revised presentence investigation report (PSR), which detailed Moore's offense conduct and attached specific amounts of methamphetamine and cocaine to the charges to which Moore had pleaded guilty. For sentencing guidelines calculation purposes, the PSR placed Moore's base offense level at 34, attributing to him the entire 17,380.2652 kilograms of converted drug weight involved in the conspiracy. Then, pursuant to U.S.S.G. § 2D1.1(b)(1), a two-level enhancement was applied because Moore possessed a firearm at his garage, where he distributed "controlled substances and possessed the firearm to protect his proceeds and narcotics." And pursuant to § 2D1.1(b)(12), a second two-level enhancement was applied because Moore "maintained a premises" at his garage to distribute narcotics. Moore received a three-level total decrease for acceptance of responsibility pursuant to § 3E1.1(a)–(b). Those calculations yielded a total offense level of 35.

Based on Moore's criminal history (which includes numerous traffic violations, misdemeanor marijuana possession, property

damage, DUI, providing false identification to law enforcement, and multiple instances of carrying a concealed weapon in violation of probation conditions), the PSR placed him in criminal history category V. That calculation included a criminal history point for a 2015 conviction for driving with a suspended license, for which he was sentenced to only 12 months probation. Before our Court, both parties agree that including a history point for this conviction was incorrect and that the correct criminal history category is IV, not V. Based on the calculations that we've already described and the erroneous criminal history category of V, the PSR calculated Moore's recommended guidelines range to be 262 to 327 months. Moore objected to numerous paragraphs of the PSR, arguing against the total drug weight attributed to him and the applications of both the firearm and premises enhancements.

At the sentence hearing, the court noted Moore's many objections to the PSR. He made so many objections to so many paragraphs that the court wondered whether the situation counted as "even pleading guilty." And based on those many objections, the government objected to Moore receiving credit for acceptance of responsibility. But the court proceeded with the hearing and summarized the parties' arguments: it explained the government's argument as "basically . . . saying [Moore] . . . deal[t] drugs out of the garage over a pretty long period of time," and there is evidence to "show that he was doing more than a little deal here or there," which makes him "a serious drug dealer that should get a serious sentence." Moore's argument was that "he's much smaller time than [the government is] making him out to be."

In response to Moore's objections to the PSR, the government called DEA Agent Ryan Brothers to testify at Moore's sentence hearing about the investigation into Moore and the drug distribution chain. Brothers testified that he investigated Moore from August 2021 to October 2023. He explained that Moore dealt drugs out of a rented, commercial garage for about six months total within the timeframe in which Brothers investigated him. He admitted that while surveilling Moore, he'd seen him wash cars at the garage, though it was only "on a few occasions." He also understood that Moore did not own the garage, but rented it, and had previously tried to sublease his lease to a mechanic.

But Brothers also saw on specific occasions "vehicles come and go" from the garage; "[t]hey'd arrive and leave again"; and he never saw those cars getting car washes or mechanical servicing. Brothers explained that based on his training and experience, that behavior was consistent with drug dealing. And "multiple" "individuals," including a "cooperating codefendant," had provided Brothers with information about Moore "being a source of supply of narcotics" in the Lakeland area.

According to Brothers, toward the end of the investigation, his team obtained a search warrant for the garage. He testified that they found, as described in the PSR, these items: a firearm; packaging materials; vacuum-seal bags; and scales without batteries, describing those items as "common things we normally see for drug traffickers." He testified that these were not materials typically found associated with a car wash or a mechanic business. Moore

was the only person at the garage when Brothers' team executed the search warrant.

During cross-examination, Brothers agreed that he'd known Moore was also in the dog-breeding business. He conceded that no one tested the scales recovered from the garage for traces of narcotics, but he didn't believe those scales were used for weighing dog food. He again explained that "there was a number of things related to drug trafficking" within the garage, and those things were within shelves on a side of the garage. And he testified that he had personally seen more than five times what appeared to be a drug transaction occurring at the garage.

At the close of Brothers' testimony, the court asked defense counsel what the offense level would be if he won all his "many objections." Counsel argued that it would be 31, and with a criminal history category of V, the guidelines range would change to 168 to 210 months. He explained that he had arguments supporting a criminal history category of II, which prompted the court to ask where the guidelines range would be if the criminal history category were II, assuming the court sustained all Moore's objections. Moore's counsel responded that the guidelines range would drop further down to 121 to 151 months. The court sustained Moore's objection to the converted drug weight attributed to him, overruled his objections to the firearm and premises enhancements, and gave Moore credit for his acceptance of responsibility. As a result of those rulings, Moore's total offense level dropped from 35 to 33.

Moving to the parties' arguments about the criminal history category, the court took up the issue of whether it was overstated. Because Moore's criminal history showed a "constant, nonstop, flagrant disregard for the law," and "at some point, it's just too much," the court decided the criminal history was not overstated and left it at V.

Finally, the court addressed an argument that Moore had raised in his sentencing memorandum concerning a "purity as proxy for culpability" issue related to the charged methamphetamine.[4] After stating that it "underst[ood] the whole argument," the court asked Moore's counsel, "out of curiosity," if the court agreed with his purity proxy argument, what Moore's guidelines range would be. Counsel asserted that the total offense level would drop to 29, and with a criminal history category of V, the range would drop to 140 to 175 months. The court responded that while it

---

[4] In his sentencing memorandum, Moore argued for a downward variance based on what he described as modern-day methamphetamine manufacturing and distribution tactics. He asserted a policy disagreement with how the guidelines assign a base offense level for offenses involving methamphetamine. He contended that the guidelines' intent behind assigning a higher base offense level for an offense involving purer methamphetamine is to use purity as a proxy for culpability. He argued that because methamphetamine is made differently now, lower-level drug dealers may be found with higher purity methamphetamine and therefore receive sentences meant for the more culpable members of the distribution chain. He asked the court to vary downward to a guidelines range based on a base offense level of 30 instead of 34 to "more appropriate[ly] [account] for his role in the instant offense."

would not agree to that range, it would take the argument into consideration because "ultimately, . . . for purposes of the [g]uidelines, they are what they are. They're just [g]uidelines."

The court found Moore's total offense level to be 33, his criminal history category to be V, and his guidelines range to be 210 to 262 months with a supervised release term of up to five years on Counts One and Two and three years on Counts Three, Four, Six, and Seven.

After making its specific guidelines range findings, the court considered the parties' arguments under § 3553(a) and heard Moore's allocution. The government argued for a sentence of at least 262 months imprisonment, highlighting the seriousness of the nature and circumstances of Moore's offenses. It pointed out that Moore was involved in large scale drug distribution, where he sold multiple drugs as a source of supply into a community that he claimed to love. Moore argued for the statutory minimum of 10 years to run current on all counts.

After weighing the § 3553(a) factors, the court explained that it found the sentence it was going to impose to be "sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing" and stated:

> I want to sentence him for what he really did, not a bunch of federal sentencing Guideline, kind of counting every single gun that he looked at and drugs that he looked at against him. I'm not doing that either. . . . [I]t's a sentence I would have given, even if there

were no Sentencing Guidelines, because I think it's the appropriate sentence, and that is [twenty] years, concurrent on everything. Not ten. Twenty. . . . [T]hat's about the best I can do in this case in light of this serious, serious drug distribution. So is that below the Guidelines? It's below the Guidelines. No, I guess the way we came out with the Guidelines, it's within the Guidelines. It's a Guideline sentence, actually.

Moore timely appealed his 240-month sentence.

## II.

We'll start with Moore's contention that the district court erred in overruling his objections to the application of the two-level sentence enhancements he received pursuant to U.S.S.G. § 2D1.1(b). We review *de novo* interpretations of the sentencing guidelines, "and we review underlying factual findings for clear error." *United States v. Tejas*, 868 F.3d 1242, 1244 (11th Cir. 2017). Clear error review is "deferential," meaning we will reverse only if "we are left with a definite and firm conviction that a mistake has been committed." *United States v. Rodriguez*, 34 F.4th 961, 968–69 (11th Cir. 2022) (citation modified).

### A.    The Premises Enhancement

Moore contends that when the district court overruled his objection to the premises two-level enhancement, it did so without evaluating the totality of the circumstances and without making a factual finding, as required under Fed. R. Crim. P. 32(i)(3)(B). Section 2D1.1(b) instructs that a defendant receive a two-level en-

hancement in his total offense calculation if he "maintained a premises for the purpose of manufacturing or distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12). Any error that the district court made in failing to resolve the factual dispute over whether Moore maintained a premises for purposes of § 2D1.1(b)(12) is harmless in light of the ample support for the enhancement found in the record.

Maintaining a premises for the purposes of the premises enhancement "includes storage of a controlled substance for the purposes of distribution." *United States v. George*, 872 F.3d 1197, 1205 (11th Cir. 2017) (citation omitted). Drug distribution doesn't have to be the "sole purpose of the premises, but [it] must be [a] primary or principal use" of it. *Id.* (citation modified). In other words, the drug distribution cannot be an "incidental" use of the premises. *Id.* When deciding whether the premises enhancement applies, a court generally "consider[s] how frequently the premises w[as] used for . . . distributing drugs versus for lawful purposes." *United States v. Rodriguez*, 75 F.4th 1231, 1242 (11th Cir. 2023). And it should evaluate "the totality of the circumstances" in making this determination. *Id.*

Moore agreed during his plea colloquy that he distributed 50 grams or more of methamphetamine to an individual as well as cocaine to another person while at *his* garage. And Agent Brothers testified that his team investigated Moore for *years*, during which time he saw Moore engage in the non-criminal behavior of washing cars only "on a few occasions." During that same time he'd

seen behavior typical of drug trafficking, which included cars coming and going — cars that Moore never washed or serviced — as well as what looked like drug transactions occurring at Moore's garage more than five times.

The fact that Brothers' team also found "a number of things related to drug trafficking, . . . found within the shelves," all on "one side of the garage," strongly indicates that Moore used his garage to store and distribute the drugs. *See George*, 872 F.3d at 1205. The totality of the circumstances supports the finding that, while Moore may have sometimes used the garage for lawful purposes, his drug storage and distribution activities weren't merely incidental. The court did not err in applying a two-level enhancement on the ground that Moore "maintained a premises for the purpose of . . . distributing a controlled substance." U.S.S.G. § 2D1.1(b)(12).

### B.    The Firearm Enhancement

Moore contends that the district court erred in overruling his objection to the firearm two-level enhancement when, in his view, there was no nexus between the firearm and the charged offenses. Under § 2D1.1(b)(1), a defendant receives a two-level enhancement in his total offense level calculation if a firearm was possessed. Possession is not hard to prove. The government need only show "by a preponderance of the evidence that the firearm was present at the site of the charged conduct." *United States v. Hall*, 46 F.3d 62, 63 (11th Cir. 1995). If a firearm is present, the enhancement applies, "unless it is clearly improbable that the [firearm] was connected with the offense." *George*, 872 F.3d at 1204 (citation and

24-13326                Opinion of the Court                13

quotation marks omitted); *see id.* (explaining that the enhancement applies if a "firearm had some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the result of accident or coincidence"); *Hall*, 46 F.3d at 63 (explaining that after the government meets its burden, the defendant must show "that a connection between the firearm and the offense is clearly improbable").

Law enforcement found a loaded firearm inside Moore's garage, along with packaging materials, vacuum-seal bags, and scales — "common things . . . normally [found with] drug traffickers." *See also United States v. Mercer*, 541 F.3d 1070, 1071 & n.10 (11th Cir. 2008) (noting that plastic bags are common packaging materials in drug distribution schemes). Moore was the only person at the garage when law enforcement found that firearm and the drug distribution paraphernalia. The government met its burden to show that a firearm was present at the site of the charged drug distribution conduct. *See Hall*, 46 F.3d at 63. Regardless of the other activities that occurred at the garage or other people who came and went, Moore did not meet his burden to show that it was "clearly improbable" that the firearm was connected with his drug-related activity. *George*, 872 F.3d at 1204–05; *see Hall*, 46 F.3d at 63–64 (upholding the sentencing increase where "the handgun was in the same room with objects ordinarily associated with the drug trade: scales, a ziplock bag containing cocaine residue, and a large amount of cash").

The district court did not err in overruling Moore's objections to the application of the firearm enhancement.

## III.

Moore's erroneously assigned criminal history category is a different story. The parties agree that the district court plainly erred in assigning a criminal history point to Moore's 2015 misdemeanor offense of driving with a suspended license. But they disagree about whether this one extra, erroneous point led to the imposition of a higher sentence. Moore contends that the district court erred in relying on a higher guidelines range than it would have if he had been assigned the correct criminal history category, thereby affecting his substantial rights. He argues that the court's requesting guidelines recalculations and referring to the 210 to 262 range before pronouncing the sentence are evidence that the court did rely on the incorrect guidelines range.

Moore did not object to the miscalculated criminal history category at his sentence hearing. Thus, we review it for plain error only.[5] *United States v. Grady*, 18 F.4th 1275, 1293 (11th Cir. 2021).

---

[5] We do not analyze the district court's statements under *United States v. Keene*, 470 F.3d 1347, 1349 (11th Cir. 2006), because of the combined force of two reasons. First, the error was not brought to the attention of the district court by an objection, which would have given it the opportunity to decide if it would have made the same decision anyway. *See United States v. Grushko*, 50 F.4th 1, 18 (11th Cir. 2022). Second, the government did not argue the *Keene* doctrine before this Court.

Because the parties agree that "the district court committed an error" and that "the error was 'plain,'" we turn to whether "the error affected [Moore's] substantial right[s]." *United States v. Steiger*, 99 F.4th 1316, 1324 (11th Cir. 2024) (en banc) (alteration adopted); *see also* Fed. R. Crim. P. 52(b). If it did, then we have the "discretion to correct the forfeited error if it [] seriously affected the fairness, integrity, or public reputation of judicial proceedings." *Steiger*, 99 F.4th at 1324 (alteration modified); *see also United States v. Rodriguez*, 398 F.3d 1291, 1298 (11th Cir. 2005).

Moore can show that the district court's error affected his substantial rights by demonstrating that there is a "reasonable probability that, but for" his criminal history category miscalculation, "the outcome of [his sentence hearing] would have been different." *Molina-Martinez v. United States*, 578 U.S. 189, 194 (2016) (citation omitted). The Supreme Court held in *Molina-Martinez* that when "the record is silent as to what the district court might have done had it considered the correct Guidelines range, the court's reliance on an incorrect range in most instances will suffice to show an effect on the defendant's substantial rights." *Id.* at 201. And, "[a]bsent unusual circumstances, he will not be required to show more." *Id.*

In light of *Molina-Martinez*, the question in this case is whether it is *clear* from the record that the court imposed a sentence that it found "appropriate irrespective of the [g]uidelines range." *Id.* at 200. That is because there cannot be "a reasonable probability of prejudice" based on a guidelines miscalculation if the

defendant would have received the same sentence regardless of the error. *Id.*; *see also United States v. Thomas*, 108 F.4th 1351, 1357 (11th Cir. 2024) ("Determining whether the use of an improper guidelines range affected a defendant's substantial rights requires us to consult the record and consider the circumstances holistically.").

When we "consider the circumstances holistically," *Thomas*, 108 F.4th at 1357, we cannot say that Moore's sentence falls within the *Molina-Martinez* exception. While the district court did state that it would have sentenced Moore to 20 years regardless of the guidelines, it then immediately asked whether the imposed sentence was below the guidelines range and expressed its mistaken belief that the sentence did fall within the guidelines range — which it didn't. Viewing the record "holistically" here, *id.*, the court's repeated requests for range recalculations based on hypothetical rulings and its immediate comparison of the imposed sentence to the erroneously calculated guidelines range collectively muddy the picture, such that we cannot say that it's clear that the court imposed a sentence truly "irrespective" of the guidelines range error. *Molina-Martinez*, 578 U.S. at 200.

And further clouding our holistic view of the record is the district court's failure to consider the sentences of Moore's co-defendants, despite mentioning the need to avoid unwarranted sentence disparities. Moore was the first of the highest three links in the distribution chain to be sentenced. The two co-defendants, who were above Moore in the distribution chain, later received

dramatically lower sentences — 87 months and 65 months imprisonment. Moore's 240-month sentence is more than two-and-a-half times longer than one co-defendant's and more than three-and-a-half times longer than the other co-defendant's. That fact alone would not convince us to vacate the sentence, but it adds to the cloudiness of the record about whether the district court would have imposed the same sentence if it had realized its error in calculating the guidelines range.

For these reasons, we find Moore has demonstrated a "reasonable probability that, but for" his criminal history category miscalculation, "the outcome of [his sentence hearing] would have been different." *Id.* at 194; *cf. United States v. Corbett*, 921 F.3d 1032, 1041 (11th Cir. 2019) ("We conclude there is a reasonable probability that the district court's error affected [the defendant's] sentence because, even though the district court varied downward from its calculated sentencing range, its sentencing decision remained tethered to what it believed to be the correct range under the Guidelines."). Therefore, we must remand for a resentencing.

Because Moore will be resentenced, we need not and do not address his other arguments about the district court's consideration of the § 3553(a) factors, which may not arise at resentencing.

**AFFIRMED, in part. Moore's sentence is VACATED, and his case is REMANDED for resentencing consistent with this opinion.**